## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 10-20060-CR-MOORE/TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

JOSE ISRAEL MELENDEZ,

      Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE

This matter is before the Court on Defendant's Motion to Suppress Statements and Physical Evidence ("Motion"). [D.E. 20]. The Court has reviewed the Motion, the Government's response [D.E. 21] and supplemental memorandum in opposition. [D.E. 30]. The Court held an evidentiary hearing regarding this Motion on March 19, 2012. For the following reasons, Defendant's Motion should be **GRANTED IN PART**.[1]

### I. BACKGROUND

On January 29, 2010, Defendant Jose Israel Melendez ("Defendant") was indicted for one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). [D.E. 1]. Defendant moves to suppress the recovered firearm as the result of an unlawful search and seizure in violation of the Fourth Amendment to the

---

[1]     Counsel for Defendant withdrew the portion of his Motion relating to Defendant's post-arrest statements and the purported improper *Miranda* warning. *See* 3/19/2012 Transcript at 131:4-5 (hereinafter "Tr. _:_-_"). Accordingly, Defendant's Motion is **DENIED AS MOOT** with respect to that issue.

United States Constitution.  Defendant contends the physical evidence should be suppressed because the detaining officers lacked the requisite reasonable suspicion of criminal activity to permit a stop and frisk, as set forth in *Terry v. Ohio*, 392 U.S. 1 (1968).  We rest our decision on the following facts presented during the March 19, 2012 hearing.

## II.  FINDINGS OF FACT

On August 23, 2009, Officer Katrina Lugo-Martinez was working the front desk of the report control center of the Miami Beach Police Department located at 1100 Washington Ave. (Tr. 6:15-25).  At approximately 7:30 p.m., she received a tip from an anonymous individual that a white male wearing all white, who was a possible drug dealer, was carrying a chrome firearm near a pizza restaurant approximately three blocks from that police station. (Tr. 8:10-17, 9:12-15).  Notably, aside from this limited information, the anonymous tipster failed to identify himself or give any contact information; failed to elaborate on the substance or genesis of his tip; failed to establish the existence of any relationship between himself and the subject of his tip; and failed to provide any predictive information relevant to the tip.  Thereafter, the anonymous tipster quickly left the police station.

Based on his demeanor and suspicious behavior, Officer Lugo did not relay this tip to dispatch.  Minutes later, the anonymous tipster returned to determine whether or not Officer Lugo had sent officers to the location of his tip; he further inquired about his "bounty" money with respect to the recovery of a firearm.  Officer Lugo asked for his name, which he responded was "Errol Green."  She then asked him for

identification to verify his identity, but he refused and exited the police station again. (Tr. 10:15 – 11:7).

Still suspicious, Officer Lugo, again rather than contacting dispatch directly, called her supervisor for advice. He advised her to relay the tip to dispatch. (Tr. 11:8-15, 16:2-9). At approximately 7:49 p.m., nearly twenty minutes after initially receiving the tip, she called it in. Consistent with her observations of the tipster, Officer Lugo very clearly told dispatch that she received a tip from a "38" or "suspicious person;" that it was not confirmed that the subject of the tip was a "38;" and that "*we don't know how valid [the tip] is*." (Tr. 11:14-24, 21:20-22:9, 23:4-15). Highlighting her suspicions, Officer Lugo specifically relayed a subsequent message to the responding officers to remind them that the tip came from a "suspicious person" and that she was unable to verify that the subject of the tip was an actual "38" or "suspicious person." During the hearing, Officer Lugo elaborated that she had asked the anonymous tipster if the subject had a badge, but she never received a clear response. She was concerned this individual was possibly a police officer or undercover agent. *Id.*[2]

The Court finds Officer Lugo's testimony credible. Officer Lugo – the only person to interact with the tipster – testified that, in effect, she received an anonymous, unreliable tip. Her contemporaneous statement that "we don't know how valid [the tip] is" makes this fact undeniably clear.

---

[2]    A portion of Officer Lugo's quoted statements come from her recorded calls made on August 23, 2009. The recording was entered into evidence as Defense Exhibit A. Officer Lugo's call to dispatch starts at approximately 00:45. Her subsequent warning to the officers starts at approximately 03:23.

Officers Bernadette Maher and Leon Azicri arrived on scene at approximately 7:50 p.m. Officer Maher exited her police vehicle and walked towards the mini-mart, which was located next to the pizza restaurant. She immediately observed a white male dressed in all white, matching dispatch's description (later identified as the Defendant), standing on the porch and facing the street.

Notably, Officer Maher testified that the Defendant was not acting unusually or suspiciously, and she further testified that she perceived no actual threat (which is corroborated by the fact that she never drew her firearm). (Tr. 38:6-11, 41:10-18). Officer Maher made eye-contact with the Defendant who then turned and *walked* into the mini-mart's entrance, located a few feet directly behind him. To be sure, the record establishes that the Defendant walked (not ran) into an enclosed business; not down the street, not through an alleyway, not towards a vehicle or along any other practical avenue of escape. Moreover, a mini-mart employee observed the Defendant walk towards the back of the store and open the cooler to retrieve a beverage. (Tr. 94-96).[3]

Officer Maher followed the Defendant into the back of the mini-mart where she confronted him by stating, "hey, come here." (Tr. 40:2-7). After immediately complying with her command, Officer Maher directed him to place his hands on the cooler, and

---

[3]     Defendant counsel intended on calling Special Agent Leon to testify as to his investigator Officer Sanchez's conversation with the mini-mart employee. However, rather than doing so, the Government stipulated to the substance of their conversations as "[Defense counsel] described them." (Tr. 94-96).

she immediately frisked him.  The frisk recovered a single chrome firearm and two rounds.[4]

Importantly, before Officer Maher searched the Defendant, she neither conducted an investigation to corroborate the veracity of the tip nor did she engage the Defendant in a consensual citizen encounter to question him about the alleged concealed firearm. (Tr. 45:20 - 46:5).  She further testified that the Defendant never acted unruly, uncooperatively, suspiciously (independently of the anonymous tip) or exhibited any illegal behavior. (Tr. 44:17 – 45:11, 48:5-12).  And there is no evidence in the record that either officer observed a bulge in Defendant's *linen* pants, which would suggest he was carrying a concealed firearm.

Aside from these facts, Officer Maher also testified that she frisked the Defendant based on three factors: 1) the anonymous tip; 2) his walk into the store after making eye-contact with her; and, 3) "*just fear of the unknown*." (Tr. 45:1-11).  But, she later conceded that she would have frisked the Defendant even if he had remained stationary.  (Tr. 45:12-19).  The Court finds Officer Maher's testimony credible in all respects, a finding that dooms the government's argument as "fear of the unknown" simply is not a predicate for a *Terry* stop and frisk.

---

[4]    After conducting the search, Officer Azicri determined the Defendant was carrying a concealed firearm without a proper license and, subsequently, that he was a convicted felon.

Also relevant to this Motion, the government conceded during the hearing that the area of 11th Street between Collins and Ocean Drive on Miami Beach is *not* a "high crime area." (Tr. 128:8-12).

### III.   ANALYSIS

The Fourth Amendment protects individuals from unreasonable searches and seizures. *See* U.S. Const. amend IV.  Consistent with Fourth Amendment principles, an officer "may conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio,* 392 U.S. 1, 30 (1968)). Reasonable suspicion is "a particularized and objective basis" for suspecting the person stopped of criminal activity. *United States v. Cortez,* 449 U.S. 411, 417-18 (1981).  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123. The officer conducting the stop "must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Id.* at 123-24 (quoting *Terry,* 392 U.S. at 27).

Reasonable suspicion, while dependent upon the "totality of the circumstances," including both the content of the information and its reliability, "can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990) (citation omitted). Even an anonymous tip can,

under certain circumstances, give rise to reasonable suspicion, as long as the information provided contains "*sufficient indicia of reliability to justify the investigatory stop.*" *Id.* (emphasis added). The Supreme Court "confirmed that the reliability of the tip - tested by the reliability of the tipster - is the key to whether an anonymous tip can provide an officer with a reasonable suspicion sufficient to permit a *Terry* stop." *United States v. Heard*, 367 F.3d 1275, 1278 (11th Cir. 2004) (citing *Florida v. J.L.*, 529 U.S. 266 (2000)).

### A.     *Officer Lugo Received an Anonymous, Unreliable Tip*

As this standard makes clear, the relevant issue relating to any tip, especially an anonymous tip, is reliability and whether it (or its source) contains "sufficient indicia of reliability" to provide an officer with a reasonable suspicion to permit a *Terry* stop.  Defendant argues this anonymous tip lacked sufficient reliability to provide reasonable suspicion, while the government advocates the opposite conclusion. On this record, however, the issue of reliability is, in effect, a non-starter: Officer Lugo's testimony clearly establishes the tip was anonymous and that neither the tipster nor the tip itself contained any additional (or persuasive) indications of reliability to support reasonable suspicion.

With respect to the anonymous issue, Officer Lugo benefitted from a face-to-face interaction with the tipster.  However, she testified that this episode lacked any of the additional indicia of reliability that typically distinguishes a face-to-face tip from an anonymous phone call.  As noted, the tipster was unknown to Officer Lugo and, while he eventually provided a name, Officer Lugo was unable to verify it.  Moreover, Officer

Lugo testified that she was unable to ascertain the validity of the tip from the tipster when she received it – especially since he quickly disappeared after providing his tip.

On balance, this anonymous face-to-face tip enjoyed none of the additional indicia of reliability common to a face-to-face tip and, therefore, it is tantamount to an anonymous tip. *See J.L.*, 529 U.S. at 274 (an anonymous tip, without additional indications of reliability, is insufficient to provide reasonable suspicion); *White v. United States*, 454 U.S. 924, 925 (1981) (White, J., dissenting) (a tip from a known informant is more reliable than an anonymous source); *Adams v. Williams*, 407 U.S. 143, 147 (1972).

On the issue of reliability, Officer Lugo was the only officer to directly interact with the tipster and thus her testimony is paramount. *See J.L.*, 529 U.S. at 270 (the veracity of an anonymous tip turns on "reliability"); *Heard*, 367 F.3d at 1279 (face-to-face interaction provides an officer with the opportunity to judge the reliability of the anonymous tip). It is undisputed that Officer Lugo contemporaneously determined that the tipster was a "suspicious person" and that she was unable to confirm whether the tip was "valid." Furthermore, her relevant actions during this period corroborated her aversion to relying on this tip.

First, she *ignored* a tip that an alleged drug dealer was allegedly carrying a concealed firearm a mere three blocks from the police station. Second, she only relayed the tip to dispatch *after* she received it for a second time and *after* she first called her supervisor for advice. Third, she specifically relayed the tip to dispatch as an

8

*unconfirmed* tip that arose from a *suspicious person*.  And finally, after officers responded, she felt compelled to again inform them that the tip was from a *suspicious person*.  In sum, the totality of Officer Lugo's reactions to the tipster and his tip clearly undercuts any argument of reliability and, as a consequence, the anonymous tip tends to lack a "sufficient indicia of reliability" to otherwise justify an investigatory stop.  *See J.L.*, 529 U.S. at 268-271; *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007).  Aside from the fact that Officer Lugo briefly observed Mr. Green, how was this interaction much different than an anonymous phone call?  Officer Lugo received information from an individual that gave an unverified name and than disappeared. Officer Lugo had no way to contact "Mr. Green" or otherwise determine the validity of his fleeting tip, much like the result after an anonymous phone call.

The government, rather than conceding that *J.L.* governs the result here as it should, struggles to maintain that the anonymous tipster's conduct sufficiently bolstered the reliability of his tip.  The government latches onto two threads: 1) he returned to the police station to follow up on his tip; and, 2) he reluctantly gave Officer Lugo his name.  But, Officer Lugo's testimony undermines the government's reliance on these points.  Ultimately, the government fails to appreciate the distinction between an anonymous tip like this one from a reliable face to face encounter that is absent in this record.

Indeed, Officer Lugo specifically testified that the tipster's departure and return to the police station actually *raised* her suspicions and contributed to her determination that this individual was a "suspicious person." (Tr. 14:1-9, 17:12-23). She also testified that his refusal to provide identification to confirm his identity was yet another factor that contributed to her conclusion that he was a "suspicious person." (Tr. 17:24-18:12, 23:16-24:5). And, she ultimately conceded that because he never provided verification, she was unable to determine whether the information supplied was actually truthful. *Id.* at 28:2-4. Thus, the government's argument has no merit.[5]

In light of this record, this case is governed by *Florida v. J.L.* and, therefore, the anonymous tip was insufficient to provide reasonable suspicion. In *J.L.*, an anonymous telephone caller informed police that a young black man, waiting at a particular bus stop and wearing a plaid shirt, was carrying a gun. *J.L.*, 529 U.S. at 268. At some time later, police proceeded to the bus stop, where they observed three black men hanging out. One of the men, J.L., was wearing a plaid shirt. The anonymous call was the police's only grounds for suspicion of illegal activity. There was no visual evidence of a firearm on J.L.'s person, nor did he make any suspicious moves. Nevertheless, the police approached him, ordered him to put his hands up, frisked him and found a gun in his pocket. *Id.* Notably, the officers acting on the tip were unable to evaluate the veracity of the tip or otherwise independently determine its reliability. *Id.* at 271. *J.L.*

---

[5]     Moreover, the government fails to cite – in either its response or supplemental memorandum – any case law to support its argument that those purported factors of reliability are sufficient to override the unequivocal testimony of Officer Lugo. *See* [D.E. 21, 30].

10

ultimately concluded, without any dissent, that the anonymous tip alone was insufficient to raise to the level of reasonable suspicion to warrant a *Terry* stop because it lacked sufficient indicia of reliability. *Id.* at 274.

The government contends, however, that *J.L.* is distinguishable and, instead, this matter is analogous to *United States v. Heard*, which held an anonymous face-to-face tip was a sufficient basis for reasonable suspicion due to additional indicia of reliability.

In *Heard*, a police officer on patrol responded to a call regarding a fight in a public train station. Upon arrival, he saw a man and a woman arguing. The woman demanded money from the man (Heard). Heard admitted to the officer that he owed the woman money.  After the officer suggested that Heard pay the woman the money he owed her, Heard walked away.  As Heard left, the woman told the officer that Heard was carrying a weapon.  The officer turned toward Heard, made eye contact, and ordered Heard to put his hands up.  The officer began walking toward Heard, and instructed the woman to remain at the station to give a statement.  The woman instead caught an arriving train, never to be seen again by the officer.  To protect his own safety and those of the train station patrons, the officer conducted a *Terry* frisk, finding a firearm. *Heard*, 367 F.3d at 1277-78.

By comparison, the facts of our case are akin to the material facts of *J.L.*  The officer here received an anonymous, unverified tip, that an individual matching a description was located in a specific place.  The tip provided the sole basis for the

11

officers' suspicion of illegal activity.  There was no visual evidence of a firearm on the Defendant and the Defendant never made any suspicious moves.  The responding officers, relying on this tip, then immediately frisked the defendant without conducting any investigation to corroborate the veracity or reliability of the tip.

On the other hand, *Heard* is clearly distinguishable.  Not only did the "responding" officer there have the opportunity to observe and evaluate the reliability of the anonymous tipster, but he also observed an interaction between the individual and tipster to conclude they had a prior relationship, which enhanced the reliability of the tip (dispositively so). *Id.* at 1279-80.  Here, we have none of those facts.  The responding officer never had any opportunity to evaluate the tipster to sustain the tip's reliability and, even if she had, she might have reached the same conclusion as Officer Lugo — that a the face-to-face interaction with the tipster *negated* rather than bolstered the tipster/tip's reliability.[6]

---

[6]     However, if the officers had elicited additional information from the tipster and then conducted an investigation to corroborate those details, this may have provided any alternative basis to establish the tip's reliability. *See, e.g., White*, 496 U.S. at 332 (holding an anonymous tip corroborated by independent police work exhibited sufficient indicia of reliability to provide reasonable suspicion to make investigatory stop); *Lindsey*, 482 F.3d at 1291 (anonymous tip deemed reliable because the tip was corroborated by the officers' independent investigation); *Heard*, 367 F.3d at 1280-81 (anonymous face-to-face tip deemed reliable based on observations by the officer that allowed him to conclude the tipster know the subject individual). *Riley v. City of Montgomery, Ala.*, 104 F.3d 1247, 1252 (11th Cir. 1997) (anonymous tip was corroborated, at least in part, by independent police work when officers verified the license plate number provided in the tip matched that of the vehicle the individual also described in the anonymous tip was driving); *United States v. Campbell*, 920 F.2d 793 (11th Cir.1991) (reasonable suspicion to stop found where police corroborated unknown informant's last minute details predicting drug transport and route to be taken by woman named "Yoli," accompanied by three armed Mexicans).  The officer could have,

Accordingly, the Court concludes that the anonymous tip lacked the requisite reliability to form an independent basis for reasonable suspicion to conduct a *Terry* stop.

### B.     The Totality of the Circumstances
Do Not Support Reasonable Suspicion

Ultimately, the government grudgingly conceded that the tip alone was insufficient to provide the officers with reasonable suspicion to conduct a *Terry* stop and frisk. (Tr. 147:10-17).  But, in addition to the anonymous, unreliable tip, the government contends the Defendant was evasive and engaged in "unprovoked flight" because he made eye-contact with Officer Maher and then pivoted 180 degrees and walked directly into the mini-mart behind him, which purportedly provided the officers with enough cumulative information to support a "particularized and objective basis" for reasonable suspicion that the Defendant was engaged in criminal activity.  *See, e.g., Cortez,* 449 U.S. at 417-18.

The Defendant argues otherwise and asserts that without a reliable tip or some other articulable basis to provide reasonable suspicion of criminal activity by the Defendant, the mere fact that he made eye-contact with Officer Maher and then walked into the mini-mart is an insufficient basis to conduct a *Terry* stop.

for instance, asked the defendant if he was armed, which could then have given cause for the officer to investigate further and protect herself through a *Terry* frisk. *Cf. United States v. Lewis*, No. 10-13567, 2012 WL 967969, at *4-5 (11th Cir. Mar. 23, 2012) (officers may question a defendant without implicating the Fourth Amendment and, once the defendant admits to carrying a concealed weapon, the officers have reasonable suspicion to conduct a *Terry* stop).  But, this never happened.  The officer conducted a frisk solely on the strength of an unreliable anonymous tip.

13

Furthermore, because Officer Maher's testimony establishes that there was no other basis to provide the officers with reasonable suspicion of criminal activity (such as nervousness, darting eyes, fidgety or sudden movements, evasive behavior or a bulge that might indicate a weapon or contraband) their frisk was unlawful.

As a preliminary matter, the government interjects "high crime area" as a fundamental component of its argument. Specifically, that factor plays a distinctive part in each case the government relies on to support its position. *See United States v. Reed*, 402 F. App'x 413, 416 (11th Cir. 2010); *United States v. Field*, 178 F. App'x 890, 891 (11th Cir. 2006); *United States v. Hunter*, 291 F.3d 1302, 1304 (11th Cir. 2002); and *United States v. Gordon*, 231 F.3d 750, 752 (11th Cir. 2000). The trouble, of course, is that the Defendant was not located in a high crime area – a fact the government readily concedes. The result is a "cart before the horse" situation, where the government focuses on what it characterizes as "unprovoked flight" as its end-all basis for evasive behavior without first establishing the requisite "high crime area" factor necessary to support such a result.

Nevertheless, because the government's argument relies entirely on "high crime area" jurisprudence, we find it prudent to touch on the genesis of that factor to further bolster our analysis. In *Illinois v. Wardlow*, the officers were driving the last car of a four car caravan converging on a Chicago neighborhood known for heavy narcotics trafficking [deemed a "high crime area"] in order to investigate drug transactions. The officers were traveling together because they expected to find a large group. As the caravan passed one building, an officer noticed the defendant standing next to a

14

building holding an opaque bag. The defendant looked in the direction of the officers and then fled down an alley. The officers eventually cornered the defendant on the street. An officer immediately conducted a protective weapons pat-down, relying on his experience that weapons were often found in the vicinity of narcotics transactions. The officer discovered a firearm. *Wardlow*, 528 U.S. at 121-22.

*Wardlow* held that a defendant's evasive and unprovoked flight, along with his presence in a high-crime area, aroused sufficient, reasonable suspicion to lawfully stop an individual and conduct a pat-down. *Id.* at 124. The court further noted that even where all of the suspect's conduct is lawful, if the conduct is ambiguous and susceptible to an innocent explanation as well as creating a reasonable suspicion of criminal activity, police officers may detain the individual to "resolve the ambiguity." *Id.* at 125. Thus, *Wardlow* gives significant weight to the presence of both "unprovoked flight" and a "high crime area."

This binary equation is missing here, however. And, without the "high crime area" factor, the government's reliance on the Defendant's conduct of making eye-contact with Officer Maher and then walking into the mini-mart fails to provide the reasonable suspicion that often exists in high crime area cases. Moreover, because Officer Maher relied solely on an anonymous, unreliable tip to arrive at Defendant's location and because she testified that Defendant otherwise acted without suspicion, the Court is hard-pressed to conclude that Defendant's *innocent conduct* provided the additional piece of information to establish the officers' reasonable suspicion.

Moreover, on these facts, and having already concluded that *J.L.* controls, the government's argument starts to resemble one that was rejected years ago: the firearm exception. *See J.L.*, 529 U.S. at 272.  However, *J.L.*, without dissent, held that notwithstanding the dangers associated with firearms, officers must have reasonable suspicion before conducting a *Terry* stop and frisk even when an officer has a hunch that a person may be armed.  Relevant here, the Supreme Court reached that decision just two months after adopting the high crime area exception in *Wardlow* and, thus, the same panel decided both cases.  This certainly underscores the Court's skepticism towards the government's argument because, with *Wardlow* fresh in mind, the Supreme Court clearly had the opportunity in *J.L.* to either raise the high crime area issue or take its approach further and create yet another exception to the *Terry* analysis – this time for firearms.   But, tellingly *J.L.* did not.  Rather, the Supreme Court drafted *J.L.* in general terms to apply broadly to preclude a *Terry* stop that is not based on reasonable suspicion supported by behavior,  "high crime area" or a reliable tip.

Of course, innocent behavior may, based on the totality of the circumstances, provide an experienced officer with the requisite reasonable suspicion to conduct a *Terry* stop.  *See, e.g, United States v. Tinoco*, 304 F.3d 1088, 1116 (11th Cir. 2002) ("Reasonable suspicion exists, moreover, if the cumulative information of which the detaining officer is aware suggests criminal activity, even if each fact, viewed in isolation, can be given an innocent explanation."); *see generally United States v.*

*Valentine,* 232 F.3d 350, 356 (3d Cir. 2000) ("In many cases the Supreme Court has found reasonable suspicion based on acts capable of innocent explanation."); *United States v. Sokolow,* 490 U.S. 1, 10 (1989) (The Supreme Court has found that "'innocent behavior will frequently provide the basis for a showing of probable cause,' and that '[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.' That principle applies equally well to the reasonable suspicion inquiry.") (quoting *Illinois v. Gates,* 462 U.S. 213, 243-44 n.13 (1983)).

But, when the totality of the circumstances encompasses solely an isolated instance of innocent behavior, as is the case here, the relevant calculus fundamentally changes. As Officer Maher testified, the basis for her reasonable suspicion to frisk Defendant included: 1) the tip (which the Court concludes was unreliable); 2) the fact that Defendant made eye-contact with her and then *walked* ("with purpose") into the mini-mart; and, 3) the "fear of the unknown." Short of that, Officer Maher testified that she never perceived an actual threat from the Defendant, that he never acted unruly, was cooperative with her at all times and never behaved suspiciously or demonstrated illegal behavior. Also, there is no record evidence that any officer observed a bulge in the Defendant's clothing. Hence, under the totality of these circumstances, the Defendant's single innocent act is neither ambiguous nor suggestive of criminal activity that would even permit an officer to "resolve the ambiguity," *see*

*Wardlow*, 528 U.S. at 125, let alone provide a "particularized and objective basis" for reasonable suspicion. *See Cortez,* 449 U.S. at 417-18.

The Court expressed its concerns about the government's argument during the evidentiary hearing and explained that without a reliable tip, or other evasive behavior to support reasonable suspicion, the government would need to provide some authority for the proposition that making eye-contact with an officer and then turning and walking, in a non-high crime area, was a sufficient basis to provide reasonable suspicion for a *Terry* stop and frisk.

In response, however, the government provided four *Wardlow* progeny cases that relied, at least in part, on the binary equation of "evasive/unprovoked flight" and "high crime area" to reach their respective conclusions. *See Reed, Field, Hunter,* and *Gordon.* [D.E. 30 at 3-8]. Not only are those cases generally inapposite to this case, but their individual facts are clearly distinguishable too. The material facts of those cases are:

> <u>Reed</u>: the court concluded that reasonable suspicion existed to search the defendant because he was located in a high crime area, the officer observed him make furtive "fight or flight" eye movements, as well as hand and body movements and posturing, all of which indicated that the defendant was attempting to conceal or discard something as the officer approached. 402 F. App'x at 416.

> <u>Fields</u>: the court determined reasonable suspicion existed because the defendant was located in a high crime area, the officers had received a tip (which was insufficient by itself), and they observed the defendant exhibit evasive behavior by first driving away in an accelerated manner from three marked patrol cars and then later walking away and ignoring the officer's commands to get his attention. 178 F. App'x at 891-92.

> <u>Hunter</u>: the court determined reasonable suspicion existed to search the defendant because he was located in a high crime area, the officers observed him

standing over and observing illegal gambling, he than began walking away "very quickly" after observing officers approach, and the officers noticed a bulge in the defendant's waistband. 291 F.3d at 1305-06.

_Gordon_: the court concluded that reasonable suspicion existed to search the defendant because he was located in a high crime area, and the officers observed the defendant's "eyes lit up," he then "ran back" (or walked quickly back) toward and entered the car, and "took off" with the defendant driving. 231 F.3d at 754-55.

The differences practically speak for themselves. Specifically, this record is completely devoid of any evidence that this Defendant – unlike the defendants in the government's cases – ever engaged in "unprovoked flight;"[7] ignored the officers' commands; acted suspiciously, nervously or dangerously; made shifty hand or body movements; motioned as if to discard contraband; displayed a visible bulge in his clothing that evinced a weapon; engaged in (or was seen observing) illegal activity; or

---

[7]    The Court acknowledges that "unprovoked flight" takes on different forms and significance. In high crime area cases, courts universally recognize a broad spectrum of unprovoked flight to support a _Terry_ stop, from headlong flight, _see Wardlow_, 528 U.S. at 124, to "furtive 'fight or flight' eye movement," _see Reed_, 402 F. App'x at 417, or mere "flight-esque" motions, _see United States v. Graham_, No. 11-20300-CR, 2011 WL 2531220, at *5 (S.D. Fla. June 16, 2011). As such, a mere walk could _potentially_ provide reasonable suspicion. But, without a corresponding factual conclusion of a "high crime area," or other tangible indicia of criminality, the quality of the purported flight and the significance placed thereon must undergo a very different calculus. In _United States v. Franklin_, 323 F.3d 1298 (11th Cir. 2003), the Eleventh Circuit elaborated on this point stating, "Franklin's flight was particularly suspicious because of its nature and its duration. He ran away at full speed as soon as he saw the officers. He did not turn and start to walk away. He did not act like he was going about his business. Instead he took off in 'headlong' flight. While any kind of flight, even walking away, might support a finding of reasonable suspicion, '[h]eadlong flight – wherever it occurs – is the consummate act of evasion." _Id._ at 1302. As _Franklin_ clarified, flight is indicative of evasion. Here, however, the Defendant walked into an enclosed business and, as the mini-mart employee noted, reached for a beverage inside a refrigerator. Notwithstanding this flexible definition, Defendant's conduct rebukes any honest characterization of actual "flight."

19

furtively diverted his eyes from Officer Maher when she made eye contact with them. In reality, the objective record demonstrates that the Defendant performed nothing more than a natural and universally common motion: he moved his head, made eye-contact with a police officer and then walked (into a store located mere feet away). Such conduct, without something more (i.e. a reliable tip, suspicious behavior, etc.), does not provide an officer the "particularized and objective basis" for reasonable suspicion necessary to conduct a *Terry* stop.

The officers here had no reliable knowledge of contemporaneous criminal activity of the Defendant. They had simply relied on a "hunch" based on an anonymous, unreliable tip coupled with this Defendant's innocent conduct of making eye-contact with and then walking away from the officers. Because the record is devoid of any other suggestion of criminal activity or suspicion, the totality of the material circumstances failed to provide the officers with a particularized and objective basis for suspecting the Defendant was engaged in criminal activity.

Finally, yet to a lesser degree, Officer Maher's candid testimony further discounts any finding that the totality of the circumstances provided a basis for reasonable suspicion. Having determined that the tip alone was insufficient, the government had to establish that the officers' subsequent observations of the Defendant provided their reasonable suspicion to warrant a *Terry* stop. And, even assuming her single material observation that Defendant made eye-contact and then walked was evasive or suspicious, Officer Maher specifically testified that had the Defendant remained stationary from the moment she exited her vehicle, she still would

20

have searched him for a firearm based on the tip alone. (Tr. 45:12-19.).[8]  This testimony, while not dispositive, certainly undercuts her statement that she grew suspicious of the Defendant because he walked away "with a purpose," especially when she further admits that she was motivated to frisk partly because of her "fear of the unknown." *Id.*  This testimony precisely evinces the generalized "inchoate and unparticularized suspicion or 'hunch'" that was denounced in *Terry*, 392 U.S. at 27.

At bottom, the officers needed to do something more, if only marginally so, to uncover or elicit additional facts or circumstances that could have provided the officers with a particularized and objection basis for their reasonable suspicion that this Defendant was engaged in criminal activity.  *See, e.g., Lewis*, 2012 WL 967969, at *4-5 (officers may question a defendant without implicating the Fourth Amendment and, once the defendant admits to carrying a concealed weapon, the officers have reasonable suspicion to conduct a *Terry* stop).  However, the record establishes they did not.  While the Court may readily acknowledge the potential dangers a firearm presents to this community and appreciates the officers' concerns in recovering such a firearm, the Supreme Court previously considered and rejected a firearm exception to the standard *Terry* analysis. *See J.L.*, 529 U.S. at 272.  Because this search and frisk effectively

---

[8]      The Court acknowledges that this issue ultimately turns on whether there is an objective basis for reasonable suspicion for criminal activity, but courts may consider the officer's subjective assessment of the facts in light of their training, expertise, and experience. *See Tinoco*, 304 F.3d at 1116; *see also United States v. Roy*, 869 F.2d 1427, 1430 (11th Cir. 1989) (same).

hinges on such an exception, it was improper under clearly established Supreme Court precedent.

## IV.   CONCLUSION

The officers lacked reasonable suspicion under the totality of the circumstances to conduct a *Terry* stop and frisk the Defendant, in a non-high crime area, based on an anonymous, unreliable tip coupled with Defendant's innocent act of making eye contact with an officer and then walking into a mini-mart. Accordingly, Defendant's Motion to Suppress Physical Evidence should be **GRANTED IN PART**.

Pursuant to Local Magistrate Rule 4(b), the parties have until **April 4, 2012** to serve and file written objections, if any, with the Honorable K. Michael Moore, United States District Judge.  The Court finds good cause to expedite the objection period in light of the imminent trial date.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein, if any.  *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 30th day of March, 2012.

    */s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge